**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X    **04 CV 5303 (NG) (VVP)**
**CAPITAL DISTRIBUTION SERVICES, LIMITED,**

     **Plaintiff,**

  **-against-**        <u>**OPINION AND ORDER**</u>

**DUCOR EXPRESS AIRLINES, INC.; MABUTU M.**
**KAMARA, SIMON BARRY; KHADY KAMARA,**
**ABOU KAMARA; and VIVIAN KAMARA,**

     **Defendants.**
-------------------------------------------------------------------X

**GERSHON, United States District Judge:**

  In this action, plaintiff Capital Distribution Services, Ltd. ("CDS") seeks to recover funds

paid to defendant Ducor Express Airlines, Inc. ("Ducor") for the provision of cargo flights that

Ducor failed to provide. Ducor has confessed judgment on CDS's claim of breach of contract. CDS

now moves for partial summary judgment against defendants Mabutu M. Kamara ("Mabutu"),

Khady Kamara ("Khady"), Abou Kamara ("Abou"), and Simon Barry ("Barry") on its claims of

fraudulent conveyance, conversion, and unjust enrichment. CDS also seeks a preliminary injunction

or, in the alternative, an order of attachment pertaining to certain real properties in Las Vegas,

Nevada, owned by Abou and defendant Vivian Kamara ("Vivian"). For the reasons set forth below,

CDS's motion for partial summary judgment is granted in part and denied in part, and Abou is

enjoined from taking any action to transfer, dispose of, encumber, or otherwise reduce or jeopardize

his interest in the properties at issue during the pendency of this action.

## FACTS

Except where otherwise noted, the following facts are not in dispute:

### The Agreement between CDS and Ducor

CDS is a shipping company organized under the laws of Hong Kong. Ducor is a corporation organized under the laws of New York. On September 9, 2005, CDS entered into an agreement (the "Agreement") with Ducor for the transportation of certain cargo from Hong Kong to Los Angeles. The Agreement was embodied in a one page memorandum on Ducor letterhead addressed to the managing director of CDS and dated September 9, 2004; the reference line states: "Cargo Transport Contract Agreement." Pursuant to the terms of the Agreement, Ducor was to provide for the transportation of CDS's cargo by air, in four separate shipments on specified dates in September and October 2004, at a cost of $450,000 per flight. CDS wired $1.8 million, in several installments, into a business checking account (the "Ducor Checking Account") held by Ducor at Washington Mutual Bank. Ducor provided the first two flights pursuant to the Agreement via an air carrier called Evergreen International Airlines, Inc. Ducor failed to provide the third and fourth flights, however. By letter dated November 30, 2004, CDS's counsel demanded a refund of $900,000 from Ducor, the amount paid for the third and fourth flights. To date, Ducor has refunded $33,065.55 to CDS.

### Transfers of Money by Ducor

At the time the Agreement was executed, Ducor held only one bank account, the Ducor Checking Account. On October 25, 2004, Mabutu, who is Ducor's principal, opened a second account (the "Ducor Savings Account") for Ducor, a platinum business savings account at Washington Mutual Bank. Mabutu then transferred $701,000 from the Ducor Checking Account

2

into the Ducor Savings Account. Between November 30, 2004 and December 19, 2004, Mabutu made wire transfers from the Ducor Savings Account to Abou, who is Mabutu's brother and adopted son, totaling $91,000, and to Barry, an entrepreneur who brokered the deal between CDS and Ducor, totaling $74,295.

At approximately 1:58 p.m. on December 20, 2004, Ducor and Mabutu were served by CDS's process server with the summons and complaint in this action, together with an order to show cause why the court should not attach Ducor's bank accounts. At 3:30 p.m. on that day, Mabutu transferred $95,000 from the Ducor Savings Account to Abou and $300,000 from the Ducor Savings Account to BHS New York Corp. ("BHS"). The latter entity is a subsidiary of Bank Habitat de Senegal, engaged in the business of transmitting money between New York and Senegal. Following the transfers, the balance in the Ducor Savings Account was less than $1,000 and the Ducor Checking Account was overdrawn. Ducor has not acknowledged having any other assets besides the two bank accounts.

### A.    *Funds Transferred to BHS*

CDS contends that, of the $300,000 that was transferred to BHS, $50,000 was subsequently transmitted to an entity called Albay Travel in Dakar, Senegal, $56,500 was transmitted to Abou, $150,000 was transmitted to an account held by Khady, who is Mabutu's wife, at the Bank Habitat de Senegal, and $43,500 was returned to Mabutu in cash. In support, CDS has submitted the deposition testimony of Abrahima Diene, general manager of BHS, a letter dated February 11, 2005 from Mabutu to Diene, and certain bank records. Diene testified that BHS received a cashier's check from Mabutu in the amount of $300,000 by Federal Express, together with a cover letter dated

December 20, 2004, photocopies of Mabutu's driver's license, passport, and social security card, and instructions about where to transmit the money. Subsequently, Mabutu went to BHS's offices in person to provide further instructions. Mabutu sought to have $56,500 transmitted to a bank account in California. Diene explained to him that BHS does not execute domestic wire transfers; the company only transmits money to Senegal. He advised Mabutu to bring the funds to Mabutu's bank, which could effect the domestic transfer. At Mabutu's request, BHS returned $56,500 to him, in cash, on February 3, 2005. Diene further testified that, pursuant to Mabutu's instructions, $50,000 was transmitted to a bank account belonging to Albay Travel Service on January 27, 2005, $81,200 was transmitted to a bank account belonging to Khady on February 17, 2005, and $68,800 was transmitted to the same account belonging to Khady on February 24, 2005. CDS submitted computer-generated receipts of these transactions, which were produced by BHS in response to a document request from CDS. Diene testified that the remaining $43,500 was refunded to Mabutu by check. CDS submitted a BHS receipt indicating that $43,500 was remitted to Mabutu on February 15, 2005.

CDS has also submitted a letter, dated February 11, 2005, from Mabutu to Diene, which was produced by BHS. The body of the letter states:

> I am very disappointed by the action of your bank. We discussed and agreed over a week ago that your company will calculate and fax me a statement on our account. Up until now, we have yet to receive it. The balance of our account was

| | |
|---|---|
| $300,000.00 | Original balance, cashier check sent |
| -50,000.00 | Transferred to Albay Travel in Dakar |
| $250,000.00 | Sub-Total before cash received. |
| -56,500.00 | Cash received on 01 February |
| $193,500.00 | Balance now with BHS |

<div style="margin-left: 2em;">

    <u>-150,000.00</u>        to be deposited into account in Dakar

    $ 43,500.00        to be mailed to M. Mabutu Kamara

Please mail me a check in the amount of $43,500.00 as soon as possible for me to handle the rest of my work.  If you wish, I will send my messenger to pick up the check.  Please do not delay this process; it will definitely mess up my business.

</div>

In addition, CDS has submitted a statement from Abou's account at a San Diego branch of Washington Mutual Bank.  It shows that a wire transfer deposit in the amount of $56,500 was made on February 3, 2005.

Defendants dispute CDS's account of how the $300,000 was distributed by BHS.  During his deposition, Mabutu testified that he instructed BHS to transmit the entire $300,000 to Air Senegal.  He admitted to receiving $56,500 in cash from BHS, but contended that the money was a commission from Air Senegal. Mabutu Dep. at 421.  He further testified that he deposited the $56,500 into one of Ducor's bank accounts and that "it stays there."  Mabutu Dep. at 414.  (Abou, however, acknowledges receiving $56,500 from Ducor, via a wire transfer by Mabutu, on February 3, 2005.  Abou Dep. at 57; Abou Aff. at ¶ 5.)  Mabutu specifically denied that any of the $300,000 was transmitted to Khady's bank account:

> Q      Did you instruct BHS to deposit this $300,000 check into Khady Kamara's account?
>
> A      No.
>
> Q      What did you instruct BHS to do with this check?
>
> A      To send it to Air Senegal.
>
> * * *
>
> Q      And did Khady Kamara authorize you to use her account?
>
> A      We spoke about it.

<div style="text-align: center;">5</div>

Q      She was aware that her account was going to be receiving $300,000?

A      She never got $300,000. It never went to her account.

Mabutu Dep. at 383, 397-98.

Later, in an affidavit, Mabutu provided a different explanation of how the $300,000 was disbursed. He stated: "There was money sent to my wife in Africa for business reasons. In fact, on December 20, 2004, a $300,000 bank check was obtained and sent to Faso Airways for the procurement of flights. These funds were initially sent to Khady Kamara's account in order for her to oversee the transaction of funds going to Faso Airways," which he identified as an African air charter company. Mabutu Aff. at ¶ 8.

### B.    *Funds Transferred to Abou*

CDS contends that $242,500 was transferred from Ducor to Abou, comprised of $41,000 transferred on November 30, 2004, $50,000 transferred on December 6, 2004, $95,000 transferred on December 20, 2004, and $56,500 transferred on February 3, 2005 after being returned by BHS. In their response to CDS's Local Rule 56.1 Statement, defendants admit that $242,500 was transferred from Ducor to Abou. They contend, however, that Ducor was obligated to make those payments to Abou under an investment agreement. Mabutu testified about the investment agreement at his deposition and later produced it to CDS. Dated November 15, 1997, the agreement is between Abou and an entity called Ducor Express Travel, Ltd.[1] It provides:

Ducor Express Travel, Ltd. and Mr. Abou M. Kamara have entered into an

---

[1] According to records maintained by the New York Secretary of State, Ducor Express Travel, Ltd. was incorporated on January 5, 1999 and dissolved on June 26, 2002. Ducor Express Airlines, Inc. was incorporated on October 10, 2002.

investment agreement as indicated below.

Mr. Abou M. Kamara has agreed to invest $150,000.00 (One Hundred & Fifty Thousand Dollars) for two years effective December 01, 1997 and ending December 01, 1999. Your investment will yield 30% interest every six months beginning December 01, 1997 which equals $45,000.00 to be deposited into your checking account at the end of every six months.

Mabutu testified that he did not know where Abou obtained the money that he invested in Ducor Express Travel, Ltd. Specifically, he stated:

Q    Where did Abou Kamara obtain the funds to invest in Ducor?

A    I don't ask my client. If you come to me to investment of money, I don't ask where the money come from.

Q    So you don't know?

A    No.

Mabutu Dep. at 147.

Abou stated in an affidavit, however, that the investment funds were proceeds from the sale of property owned jointly by Abou and Mabutu. With Abou's permission, Mabutu sold the property and invested Abou's share in his business. Abou did not participate directly in the sale and the proceeds never came into his possession. Abou Aff. at ¶ 2.

### C.    *Funds Transferred to Barry*

CDS contends that $74,295 was transferred from Ducor to Barry, comprised of $70,000 transferred on November 22, 2004, $3,350 transferred on November 23, 2004, and $945 transferred on December 9, 2004. Defendants admit that the funds were transferred to Barry, but assert that they constituted commissions owed to Barry by Ducor for Barry's work on the deal with CDS.

Barry testified that he does business as an independent contractor and was never an employee, officer, director or shareholder of Ducor. In 2004, after seeing an advertisement indicating that CDS was seeking air transportation for cargo, he brokered the deal between CDS and Ducor. He testified that he had an agreement with Ducor such that he and Ducor would share any profits made from the CDS deal equally. Barry Dep. at 23-24. He had anticipated that his share of the profit would be approximately $35,000 per flight, for a total of $140,000. Barry Dep. at 37. Mabutu also testified that Ducor and Barry entered into a commission agreement, but could not remember its terms.

Barry testified that he received $72,735 from Ducor in September 2004 as commissions on the first and second flights and the $74,295 contested by CDS as commissions on the third and fourth flights.

**Purchase of the Las Vegas Properties**

Abou is a petty officer, second class, in the United States Navy, who earns approximately $45,000 per year. He resides in San Diego, California, with his wife, Vivian, and their six year old daughter. In December 2004, Abou took steps to purchase three parcels of real property in Las Vegas (collectively, the "Las Vegas Properties") located, respectively, at 6052 Draft Horse Drive, North Las Vegas, Nevada 89031; 1732 Mizzenmast Avenue, North Las Vegas, Nevada 89032; and 3313 Conterra Park Avenue, North Las Vegas, Nevada 89081.

With respect to the property located at 6052 Draft Horse Drive, the purchase price, including closing costs, was $300,840.64. Abou paid $3,000 on December 20, 2004 as an earnest money deposit and $59,758.51 on January 31, 2005 as a down payment. The balance was paid with the

proceeds from a mortgage loan by Downey Savings and Loan Association. A deed evidencing Abou's purchase of the property was executed on January 24, 2005 and recorded in the Clark County Recorder's office on February 3, 2005.

With respect to the property located at 1732 Mizzenmast Avenue, the purchase price, including closing costs, was $266,704.96. Abou paid $3,000 on December 21, 2004 as an earnest money deposit and $56,235.34 on February 17, 2005 as a down payment. The balance was paid with the proceeds from a mortgage loan by Republic Mortgage. A deed evidencing Abou's purchase of the property was executed on February 2, 2005 and recorded in the Clark County Recorder's office on February 23, 2005.

With respect to the property located at 3313 Conterra Park Avenue, the purchase price was $287,490. Abou paid $3,500 on December 30, 2004 as an earnest money deposit. A purchase agreement executed on the same day indicates Abou's intention to purchase the property jointly with Vivian. The purchase agreement lists the estimated down payment as $10,874 and the estimated proceeds from a mortgage loan by KB Home Mortgage Company as $273,116. The record does not indicate whether Abou and Vivian closed on the property as planned.

CDS commenced an action against Abou and Vivian in Nevada state court in November 2005 and filed notices of pendency on the Las Vegas Properties to prevent their transfer or encumbrance. Shortly after being served with the summons and complaint in the Nevada action, Abou took steps to borrow an additional $43,000 against the property located at 6052 Draft Horse Drive and to put the property up for sale. Abou and Vivian have moved to vacate all three notices of pendency.

**The Present Action**

By complaint dated December 5, 2004, CDS commenced this action against Ducor, Mabutu, and Barry. The complaint asserted claims of conversion, unjust enrichment, constructive trust, monies had and received, breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentation. CDS filed an amended complaint on June 29, 2005 and a second amended complaint on March 22, 2006, naming Khady, Abou, Vivian, and Abraham Sillah,[2] a business associate of Mabutu's, as additional defendants and asserting additional claims of fraudulent conveyance, unlawful distribution, piercing the corporate veil, conspiracy, and equitable lien.

Pursuant to a stipulation filed on November 28, 2005, Ducor confessed judgment in the amount of $866,934.45, representing the amount CDS paid for the third and fourth flights ($900,000) minus the amount refunded by Ducor ($33,065.55). CDS has moved for partial summary judgment against Mabutu, Khady, Abou, and Barry on its claims of fraudulent conveyance, conversion, and unjust enrichment. CDS has also moved for a preliminary injunction or, in the alternative, an order of attachment with respect to the Las Vegas Properties. Pending its determination of CDS's motion for injunctive relief, the court, on February 22, 2006, entered a temporary restraining order against Abou, enjoining him from "transferring, disbursing, pledging, or otherwise encumbering" the Las Vegas Properties and ordered plaintiff to file an irrevocable letter of credit in the amount of $150,000 as security.

---

[2]The claims against Sillah were dismissed by stipulation dated May 4, 2006.

## DISCUSSION

### I.     CDS's Motion for Partial Summary Judgment

#### A.     Summary Judgment Standard

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The standard for granting summary judgment mirrors the standard for a directed verdict under Rule 50(a), which permits the court to grant a motion for judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury" to decide an essential issue in favor of the non-moving party.  Fed. R. Civ. P. 50(a)(1); *see id*. at 323.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is "some metaphysical doubt" as to the material facts.  *Matsushita Electric Industrial Co, Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To prevail, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *id*. at 587.  A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.  *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

### B. Fraudulent Conveyance

New York's Uniform Fraudulent Conveyance Act ("UFCA"), N.Y. Debtor and Creditor Law §§ 270-81 (McKinney 2001), provides remedies for both constructive fraud and actual fraud. Under the statute, if a conveyance is made without fair consideration and the transferor is a debtor who is insolvent or will be rendered insolvent by the transfer, the conveyance is deemed constructively fraudulent. N.Y. Debtor and Creditor Law § 273. In general, the party challenging the conveyance has the burden of proving both insolvency and the lack of fair consideration. *United States v. McCombs*, 30 F.3d 310, 324 (2d Cir. 1994). In cases of intra-family transfers, where facts concerning the nature of the consideration are within the exclusive control of the transferee, however, the burden shifts to the transferee to prove the adequacy of consideration. *Id*. If the conveyance is found lacking in consideration, the burden also shifts to the transferee to prove continued solvency after the transaction. *RTC Mortgage Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 199 (S.D.N.Y. 2001); *United States v. Hansel*, 999 F. Supp. 694, 699 (N.D.N.Y. 1998).

If a conveyance is made with actual intent to hinder, delay, or defraud either present or future creditors, then it is deemed actually fraudulent. N.Y. Debtor and Creditor Law § 276. Actual intent need not be proven by direct evidence, but may be inferred from the circumstances surrounding the allegedly fraudulent transfer. *Steinberg v. Levine*, 6 A.D.3d 620, 621 (2d Dep't 2004). In determining whether a conveyance was fraudulent, courts will consider "badges of fraud," which are circumstances that accompany fraudulent transfers so commonly that their presence gives rise to an inference of intent. *Id*. The badges of fraud include lack or inadequacy of consideration, family, friendship, or close associate relationship between transferor and transferee, the debtor's retention of possession, benefit, or use of the property in question, the existence of a pattern or series of

transactions or course of conduct after the incurring of debt, and the transferor's knowledge of the creditor's claim and the inability to pay it. *Id*.

Generally, the creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance. *Neshewat v. Salem*, 365 F. Supp. 2d 508, 521 (S.D.N.Y. 2005) (applying New York law). However, where the assets fraudulently transferred no longer exist or are no longer in the possession of the transferee, a money judgment may be entered against the transferee in an amount up to the value of the fraudulently transferred assets. *Id*. at 521-22; *see Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1172 (2d Cir. 1993). When a conveyance is proved to have been made by a debtor and received by a transferee with actual intent to defraud under Section 276, the creditor is entitled to recover reasonable attorney's fees from the debtor and transferee. N.Y. Debtor and Creditor Law § 276-a.

### 1. *Mabutu Kamara*

CDS provides evidence that $43,500 was transferred from Ducor to Mabutu via BHS: Diene testified that Mabutu transferred $300,000 from Ducor to BHS on December 20, 2004 and that $43,500 was subsequently returned to Mabutu. Diene's testimony is corroborated by the February 11, 2005 letter from Mabutu to Diene and the BHS receipt indicating that $43,500 was remitted to Mabutu on February 15, 2005. CDS further contends that "not only did [Mabutu] cause the funneling of $43,500 to himself via BHS, but he caused hundreds of thousands of additional transfers of CDS' funds for his direct or indirect benefit." Plaintiff's Brief at 25. CDS does not, however, itemize the additional transfers, which it claims total $289,836.

In response, defendants submit an affidavit from Mabutu, which asserts that all of the funds deposited with BHS were transmitted to Khady in Africa so that she could procure flights for CDS from an air charter company called Faso Airways. Mabutu Aff. at ¶ 8. During his deposition, however, Mabutu had testified that none of the $300,000 was transmitted to Khady and that the entire sum was transmitted directly to Air Senegal. Mabutu Dep. at 383, 397-98. Since the assertion in Mabutu's affidavit contradicts his prior deposition testimony, it cannot satisfy defendants' burden in opposing the motion. *See Raskin*, 125 F.3d at 63.

With respect to the alleged transfers totaling $289,836, CDS has not submitted sufficient evidence to satisfy its burden under Rule 56. Although CDS submits nine receipts documenting transfers and withdrawals by Mabutu from Ducor's banks accounts totaling $68,213.68, these receipts are not self-authenticating, do not, in all cases, indicate the recipients of the transfers, and do not evince the purposes of the transfers. CDS submits no evidence at all concerning the remaining $221,622.32 that it alleges was fraudulently conveyed to Mabutu. Thus, there is insufficient evidence to establish that the transfers totaling $289,836 were fraudulent within the meaning of either Section 273 or Section 276.

The evidence submitted by CDS is, however, sufficient to establish that $43,500 was transferred from Ducor to Mabutu via BHS. The evidence also establishes the presence of several badges of fraud in the transfer: It is undisputed that the initial transfer to BHS was made on the same day that Ducor and Mabutu were served with process in this action. The BHS transaction was one of a series of transactions made on that day that effectively drained Ducor's bank accounts. The use of BHS as an intermediary served to obscure the path of the funds. Moreover, as principal of Ducor, Mabutu both effected the transactions and retained control of the funds. And, the conveyance was

unsupported by consideration. *See Steinberg*, 6 A.D.3d at 621. Although defendants assert that the transfers were made without fraudulent intent, they offer no competent evidence to raise a triable question of fact on the issue.

In sum, the court finds that the $43,500 transfer to Mabutu constitutes a fraudulent conveyance within the meaning of Section 276 and grants summary judgment to CDS accordingly.[3] Upon a properly supported application at the conclusion of this action, CDS shall be entitled to recover its attorney's fees for prosecuting this claim from Ducor and Mabutu.

### 2.    *Khady Kamara*[4]

Diene testified that, at Mabutu's direction, BHS transmitted $81,200 to an account held by Khady at the Bank Habitat de Senegal in Dakar, Senegal, on February 17, 2005 and transmitted an additional $68,800 to the same account on February 24, 2005. Thus, according to Diene, BHS

---

[3]Although CDS asserts piercing the corporate veil as a basis of liability against Mabutu in its second amended complaint, it does not argue that theory in the instant motion. As a result, the court does not consider whether the evidence in the record establishes that Mabutu dominated Ducor and abused the corporate form.

[4]Defendants, in their answer, assert a jurisdictional defense with respect to Khady. In his affidavit in response to CDS's motion for partial summary judgment, Mabutu states:

> Khady Kamara is my wife and since July of 2003, she has been residing in Africa. She has not engaged in any business activity in New York since 2003, and based on my conversations with her, she certainly was not personally served with any papers summoning her to court for this case. Therefore, I respectfully request the Court to find that Khady Kamara was not joined in this action and deny plaintiff's motion in its entirety with respect to this defendant.

Mabutu Aff. at ¶ 2. Since Mabutu's assertion that Khady was not personally served is not based on personal knowledge, it has no evidentiary value. Defendants submit no competent evidence to support Khady's jurisdictional defense and make no argument concerning lack of personal jurisdiction or improper service of process in the brief that they submitted in opposition to CDS's motion for partial summary judgment. In the brief, defendants address the claims against Khady on the merits only. As a result, the court does not consider Khady's jurisdictional defense in connection with CDS's motion for partial summary judgment.

transmitted a total of $150,000 to Khady's account at the Bank Habitat de Senegal. The February 11, 2005 letter from Mabutu to Diene corroborates Diene's testimony.

In response, defendants argue that, "[c]oncerning Khady Kamara, the affidavit of Mabutu Kamara states that funds were transferred to her merely as an intermediary so as to arrange payment to FASO Air Cargo." Defendants' Brief at 4. As discussed above, since the content of Mabutu's affidavit contradicts the testimony given at his deposition, the affidavit cannot satisfy defendants' burden in opposing the motion.

The evidence submitted by CDS is sufficient to establish that $150,000 was transferred from Ducor to Khady via BHS. The evidence also establishes the presence of several badges of fraud in the transfer: As discussed above, the initial transfer to BHS occurred on the same day that Ducor and Mabutu were served with process in this action, and the use of BHS as an intermediary in the transaction served to obscure the path of the funds. In addition, the transferee was the wife of Ducor's principal, the funds were sent to an overseas account, the conveyance was unsupported by consideration, and Mabutu has given multiple, conflicting descriptions of the transaction. *See Steinberg*, 6 A.D.3d at 621.

As a result, the court finds that the two transfers to Khady, totaling $150,000, constitute fraudulent conveyances within the meaning of Section 276 and grants summary judgment to CDS accordingly. Upon a properly supported application at the conclusion of this action, CDS shall be entitled to recover its attorney's fees for prosecuting this claim from Ducor and Khady.

### 3. *Abou Kamara*

It is undisputed that Ducor transferred $41,000 to Abou on November 30, 2004, $50,000 to

16

Abou on December 6, 2004, $95,000 to Abou on December 20, 2004, and $56,500 to Abou on February 3, 2005, for a total of $242,500. (From the undisputed facts and the evidence submitted by CDS– in particular, Diene's testimony, the February 11, 2005 letter from Mabutu to Diene, and the statement from Abou's bank account– it can be inferred that the $56,500 was part of the $300,000 transferred to BHS on December 20, 2004 and that it was returned to Mabutu in cash on February 3, 2005 and then wired to Abou. Ducor has not submitted any competent evidence to rebut this inference.) CDS claims that these transfers were fraudulent, but defendants contend that Ducor was obligated to make the transfers to Abou pursuant to a written investment agreement.

The investment agreement produced by defendants, dated November 15, 1997, is between Abou and an entity called Ducor Express Travel, Ltd., which was incorporated on January 5, 1999, over one year after the date of the investment agreement, and was dissolved on June 26, 2002, nearly four months before Ducor Express Airlines, Inc., the corporate defendant in this case, was incorporated. Defendants have submitted no evidence that Ducor Express Airlines, Inc. is a successor in interest to Ducor Express Travel, Ltd. or that Ducor Express Airlines, Inc. is otherwise liable for Ducor Express Travel, Ltd.'s debt to Abou. Thus, defendants' contention that Ducor was obligated to make the transfers to Abou is not supported by the evidence.

To the contrary, the evidence in the record establishes the presence of several badges of fraud in the transfers from Ducor to Abou: The transfers began on November 30, 2005, the day on which CDS first demanded a refund from Ducor. The $95,000 transfer occurred on the day that Ducor and Mabutu were served with process. Abou is the brother and adopted son of Mabutu, Ducor's principal. The conveyances were not supported by any valid consideration. Further, Abou and Mabutu gave conflicting accounts of Abou's alleged investment in Ducor. Abou stated that the

investment funds were proceeds from a sale of joint property executed by Mabutu. Mabutu, on the other hand, testified that he did not know the origin of the investment funds. In addition, since the $56,500 transferred to Abou was part of the $300,000 transferred to BHS on December 20, 2004, that transfer exhibits the same badges of fraud as the other BHS transfers discussed above.

As a result, the court finds that the transfers from Ducor to Abou, made between November 30, 2004 and February 3, 2005, totaling $242,500, constitute fraudulent conveyances within the meaning of Section 276 and grants summary judgment to CDS accordingly. Upon a properly supported application at the conclusion of this action, CDS shall be entitled to recover its attorney's fees for prosecuting this claim from Ducor and Abou.

### 4. *Simon Barry*

Although the second amended complaint alleges that Barry is an "officer and/or agent of Ducor," Barry testified that he is an independent contractor and never served as an employee, officer or director of Ducor and that he never held any shares of Ducor's stock. It is undisputed that Barry brokered the deal between CDS and Ducor. It is also undisputed that Ducor transferred $70,000 to Barry on November 22, 2004, $3,350 to Barry on November 23, 2004, and $945 to Barry on December 9, 2004, for a total of $74,295.

Under New York law, the satisfaction of a pre-existing debt qualifies as fair consideration for a transfer of property. *In re Sharp International Corp.*, 403 F.3d 43, 54 (2d Cir. 2005). Unlike the Bankruptcy Code, the UFCA is a set of legal rather than equitable doctrines, whose purpose is not to provide equitable distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property. *HBE Leasing Corp. v. Frank*, 48

F.3d 623, 634 (2d Cir. 1995). Thus, the UFCA does not bestow a broad power to reorder creditor claims or to invalidate transfers that were made for fair consideration, at least where no actual intent to hinder, delay, or defraud creditors has been shown. *Id*. Even the preferential repayment of pre-existing debt to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors, because the basic object of fraudulent conveyance law is to see that the debtor uses his or her limited assets to satisfy *some* of his or her creditors; it normally does not try to choose among them. *Id*. at 634. New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration. *Sharp International Corp.*, 403 F.3d at 54; *Id*.

The testimony of Mabutu and Barry demonstrates that issues of material fact exist concerning whether Ducor owed Barry money pursuant to a commissions agreement and whether Barry was an officer, director, or shareholder of Ducor. If Ducor did owe money to Barry for his work on the CDS deal, then that obligation would constitute fair consideration for the transfers to Barry, unless Barry was an officer, director, or shareholder of Ducor. Since issues of material fact exist, plaintiff's motion for summary judgment on its claim of fraudulent conveyance against Barry is denied.

### B. Conversion

To establish a claim of conversion under New York law, a plaintiff must show legal ownership or an immediate superior right of possession to a specifically identifiable thing and must show that the defendant exercised unauthorized dominion over the thing in question to the exclusion of the plaintiff's rights. *Batsidis v. Batsidis*, 9 A.D.3d 342, 343 (2d Dep't 2004). Money may be the

subject of conversion if it is specifically identifiable and there is an obligation to return it or treat it in a particular manner. *Hoffman v. Unterberg*, 9 A.D.3d 386, 388 (2d Dep't 2004). When funds are provided for a particular purpose, the use of those funds for an unauthorized purpose constitutes conversion. *Id*. Where possession of the property is initially lawful, conversion occurs when there is a refusal to return the property after a demand. *Id*.

Here, CDS has failed to establish any claim of conversion because, under the Agreement, Ducor had no obligation to segregate the funds paid by CDS until its obligations under the Agreement were fully performed or to return a proportionate share of the funds upon failure to provide one of the agreed upon flights. The funds that CDS paid Ducor represented consideration for the performance of a contractual service. Once in possession of the funds, Ducor was free to use them for any purpose it chose without prior authorization from CDS. When Ducor failed to provide the third and fourth flights, CDS had a right to recover damages for breach of contract, but not a right to refund of the specific funds that it paid Ducor, notwithstanding the demand made by CDS's counsel.

Accordingly, with respect to all claims of conversion, CDS's motion for summary judgment is denied.

## C.      Unjust Enrichment

Under New York law, claims of unjust enrichment sound in quasi-contract. *Beth Israel Medical Center v. Horizon Blue Cross and Blue Shield of New Jersey, Inc.*, 448 F.3d 575, 586 (2d Cir. 2006) (citing *Goldman v. Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)). Quasi-contract is an obligation imposed by law, in the absence of a valid and enforceable contract, because of the

conduct of the parties or some special relationship between them, to prevent unjust enrichment. For example, when two parties have bargained with each other on the terms of a contract but have failed to create an enforceable contract, whether because of failure to reach a meeting of the minds on terms or because of noncompliance with some formal requisite of contract law, and one party has conferred a benefit on the other, that party may seek recovery in quasi-contract. *U.S. East Telecommunications, Inc. v. U.S. West Communications Services*, 38 F.3d 1289, 1299 (2d Cir. 1994). Thus, "[q]uasi contracts are not contracts at all, although they give rise to obligations more akin to those stemming from contract than from tort." *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.*, 70 N.Y.2d 382, 388 (1987) (quoting *Bradkin v. Leverton*, 26 N.Y.2d 192, 196 (1970)).

The facts of this case do not give rise to any claim of unjust enrichment. CDS paid money to Ducor pursuant to the terms of a valid and enforceable contract. Ducor breached the contract and, as a result, is liable to CDS for damages. Ducor's transfer of funds to other defendants to prevent CDS from collecting a judgment against it is more in the nature of a tort than a contractual wrong. It gives rise to claims under the UFCA, as discussed above, but does not create quasi-contractual liability. Accordingly, with respect to all claims of unjust enrichment, CDS's motion for summary judgment is denied.

## II.     CDS's Motion for Preliminary Injunction or Order of Attachment

CDS has moved the court to enter a preliminary injunction against Abou and Vivian pursuant to Federal Rule of Civil Procedure 65 enjoining any transfer, disposition, encumbrance, or other transaction involving the Las Vegas Properties. Alternatively, CDS seeks an order of attachment of the Las Vegas Properties pursuant to Federal Rule of Civil Procedure 64 and Section 6201 of New

York's Civil Practice Law and Rules.

### A.     Attachment

Although defendants make no argument against attachment on jurisdictional grounds, plaintiff cites no authority, and the court is aware of none, that supports a court's power to attach property that lies outside of its territorial jurisdiction.  Accordingly, the court will not enter an order of attachment with respect to the Las Vegas Properties.

### B.     Preliminary Injunction

To obtain a preliminary injunction, an applicant must show that he or she is likely to suffer irreparable injury if such relief is denied and there is either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the applicant's favor.  *See, e.g., In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2d Cir. 1985).  A preliminary injunction is appropriate to grant relief of the same character as that which may be granted finally.  *Republic of the Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986).

Here, it is unlikely that CDS will prevail on its claims for equitable relief aimed at the Las Vegas Properties– namely, its claims seeking the imposition of a constructive trust or an equitable lien.  Under New York law, to state a claim for the imposition of a constructive trust, a plaintiff "must plead and prove four essential elements:  (1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment."  *Doxey v. Glen Cove Community Development Agency*, 28 A.D.3d 511, 512 (2d Dep't 2006).  Although these elements

are construed broadly, in accordance with the equitable nature of the remedy, *see Cruz v. McAneney*,

___ A.D.3d ___, 2006 WL 1174142 (May 2, 2006), it is unlikely that CDS can satisfy them here.

CDS did not have any relationship with Abou and Vivian, much less a relationship that was

confidential or fiduciary in nature.  Even if CDS's relationship with Ducor could serve as a basis for

a constructive trust claim against Abou and Vivian, which seems doubtful, that relationship was not

confidential or fiduciary in nature either.  CDS and Ducor are both independent corporate entities

that engaged in an arm's length business transaction.  On the record before the court, CDS has not

demonstrated a likelihood of success on the merits of its constructive trust claim, nor even

sufficiently serious questions going to the merits to make them a fair ground for litigation.

Similarly, it is unlikely that CDS can prevail on a claim of equitable lien against Abou and

Vivian.  Under New York law, an equitable lien "is dependent upon some agreement express or

implied that there shall be a lien on specific property." *Teichman v. Community Hospital of Western*

*Suffolk*, 87 N.Y.2d 514, 520 (1996).  The agreement must deal with some particular property either

by identifying it or by so describing it that it can be identified and must indicate with sufficient

clearness an intent that the property so described or rendered capable of identification is to be held,

given or transferred as security for the obligation.  *Id*.  Thus, on the facts so far established, it does

not appear that CDS is entitled to an equitable lien on the Las Vegas Properties.

CDS's claim of fraudulent conveyance against Abou is essentially a claim for money

damages since the property– that is, the money– that was the subject of the conveyance is no longer

in Abou's possession.  *See Newshewat*, 365 F. Supp. 2d at 521-22.  As a general rule, a party may

not obtain injunctive relief where it is claiming a loss that can be adequately remedied by an award

of money damages.  *Feit & Drexler, Inc.*, 760 F.2d at 416.  Nevertheless, a preliminary injunction

is appropriate to prevent a defendant from taking actions to frustrate a judgment. *See Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994) ("[A]n injunction may issue to stop a defendant from dissipating assets in an effort to frustrate a judgment."); *Abish v. Northwestern National Ins. Co. of Milwaukee*, 924 F.2d 448, 454 (2d Cir. 1991) ("In a few instances . . . we have recognized exceptions to [the] general rule and found irreparable harm where a party sought only money damages); *Republic of the Philippines*, 806 F.2d at 356 ("[P]reliminary injunctions are proper to prevent a defendant from making a judgment uncollectible."); *In re Feit & Drexler, Inc.*, 760 F.2d at 416 ("We find no abuse of the district court's discretion in its conclusion that this is an appropriate case for the issuance of injunctive relief to prevent [defendant] from making uncollectible any judgment the [plaintiff] may eventually obtain against her.").

The evidence in the record supports a finding that Abou has taken steps to dissipate and conceal his assets and, unless the court issues an injunction, will continue to do so, which would frustrate CDS's attempts to collect a judgment against him, causing CDS irreparable injury. Shortly after Abou was served with process in the Nevada action, he took steps to borrow an additional $43,000 against the property located at 6052 Draft Horse Drive and to put it up for sale. At his deposition in May 2005, he repeatedly evaded questions about his assets. He acknowledged owning two pieces of property in San Diego, California– a house located at 4869 Falconhurst and a condominium located at 2666 Caminito Secoya– but refused to say whether he owned any other real property. Abou Dep. at 53-54. (Notably, he did not identify any of the Las Vegas Properties, which were unknown to CDS at the time.) He acknowledged receiving rental income from the condominium, but refused to say how much. Abou Dep. at 49-50. He refused to answer questions about whether he held any brokerage accounts and provided only select bank statements, which he

redacted, in response to a document request by CDS. Abou Dep. at 40-41, 61-63. At one point, after refusing to answer any more questions about his assets, he abruptly walked out of the deposition. Abou Dep. at 76. Both at his deposition and in an affidavit submitted in response to CDS's motion for a preliminary injunction or order of attachment, Abou made misleading statements about the amount of money that had been conveyed to him by Ducor through Mabutu. At his deposition, Abou testified that the total amount of funds that he received from Ducor was $106,500, comprised of a $50,000 transfer made on December 6, 2004 and a $56,500 transfer made on February 3, 2005. Abou Dep. at 64-65. In the affidavit, Abou stated that he received a total of $147,500 from Ducor, acknowledging receipt of $41,000 on November 30, 2004 in addition to the payments acknowledged in his deposition testimony. Abou Aff. at ¶¶ 3-5. But in their response to CDS's Local Rule 56.1 Statement, defendants admit that Ducor transferred a total of $242,500 to Abou. In addition to the $41,000 transferred on November 30, 2004, the $50,000 transferred on December 6, 2004, and the $56,500 transferred on February 3, 2005, Abou received a $95,000 transfer from Ducor on December 20, 2004, the day that Ducor and Mabutu were served with process in this action. Overall, the record as a whole demonstrates that Abou, together with Mabutu, has been engaged in a pattern of conduct designed to frustrate any efforts by CDS to collect the money owed to it by Ducor. Accordingly, the court finds that CDS is likely to suffer irreparable injury if a preliminary injunction is not issued.

Insofar as the court has granted summary judgment in its favor, CDS has already succeeded on the merits of its fraudulent conveyance claim against Abou.[5] Thus, CDS has satisfied the requirements for a preliminary injunction. Abou is hereby enjoined from taking any action to

---

[5]That the court has granted summary judgment to CDS on its fraudulent conveyance claim against Abou does not obviate a preliminary injunction. Several claims in this action remain outstanding, and a final judgment cannot be entered until all claims are resolved.

transfer, dispose of, encumber, or otherwise reduce or jeopardize his interest in any of the Las Vegas Properties during the pendency of this action. Plaintiff's irrevocable letter of credit in the amount of $150,000, dated March 7, 2006 and filed with the Clerk of Court on March 9, 2006, shall remain in effect for the duration of the preliminary injunction.

## CONCLUSION

For the reasons set forth above, CDS's motion for partial summary judgment is granted in part as follows: On CDS's claim of fraudulent conveyance against Mabutu M. Kamara, the court grants summary judgment to CDS in the amount of $43,500. On CDS's claim of fraudulent conveyance against Khady Kamara, the court grants summary judgment to CDS in the amount of $150,000. On CDS's claim of fraudulent conveyance against Abou Kamara, the court grants summary judgment to CDS in the amount of $242,500. In all other respects, CDS's motion for partial summary judgment is denied. CDS's motion for a preliminary injunction or an order of attachment is granted as follows: Abou Kamara is preliminarily enjoined from taking any action to transfer, dispose of, encumber, or otherwise reduce or jeopardize his interest in the real properties located at 6052 Draft Horse Drive, North Las Vegas, Nevada, 89031; 1732 Mizzenmast Avenue, North Las Vegas, Nevada 89032; and 3313 Conterra Park Avenue, North Las Vegas, Nevada 89081 during the pendency of this action. Plaintiff's irrevocable letter of credit in the amount of $150,000, dated March 7, 2006 and filed with the Clerk of Court on March 9, 2006, shall remain in effect for the duration of the preliminary injunction.

**SO ORDERED.**

_____
        **/S/**
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
       July 21, 2006